927 A.2d 209

**POCONO MANOR INVESTORS, LP, Petitioner,**

**v.**

**PENNSYLVANIA GAMING CONTROL BOARD, Respondent,**

**Mount Airy # 1, LLC, Intervenor.**

Supreme Court of Pennsylvania.

Argued May 15, 2007.

Decided July 12, 2007.

626

630

Frederick H. Kraus, Esq., J. Scott Kramer, Esq., Duane Morris, L.L.P., John Thomas Crutchlow, Esq., Philadelphia, for Sands Bethworks Gaming, L.L.C.

Michael David Sklar, Esq., Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A., John M. Donnelly, *pro hac vice* Levine, Staller, Sklar, Chan, Brown & Donnelly, P.A., Atlantic City, New Jersey, William H. Lamb, Esq., Lamb McErlane, P.C., Scot Russel Withers, Esq., West Chester, Richard A. Sprague, Esq., Sprague & Sprague, Philadelphia, Joseph Thomas Wright, Esq., Wright & Reihner, P.C., Scranton, for Mount Airy #1, L.L.C.

Thomas W. Corbett, Jr., Esq., PA Office of Attorney General, Harrisburg, for Attorney General of the Commonwealth of Pennsylvania.

Daniel King Bricmont, Esq., Susan A. Meredith, Esq., William R. Caroselli, Esq., Caroselli, Beachler, McTiernan & Conboy, L.L.C., Pittsburgh, for Pocono Manor Investors, L.P.

Richard Douglas Sherman, Esq., PA Gaming Control Board, Frank T. Donaghue, Esq., Linda S. Lloyd, Esq., Lawrence T. Hoyle, Jr., Esq., Hoyle, Fickler Herschel & Mathes, L.L.P., Harrisburg, for Pennsylvania Gaming Control Board.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

632

*OPINION*

Chief Justice CAPPY.

This case involves a challenge to the adjudication and order of the Pennsylvania Gaming Control Board (hereafter "Board") dated February 1, 2007, in the matters of the applications for Category 2 slot machine licenses in a revenue—or tourism-enhanced location, 4 Pa.C.S. § 1304(a). Specifically, Petitioner Pocono Manor Investors challenges the Board's decision approving a Category 2 license to Intervenor Mount Airy # 1. For the reasons stated herein, we affirm the Board's determination.

In July 2004, the Pennsylvania Legislature enacted the Pennsylvania Race Horse Development Act ("Act"), 4 Pa.C.S. § 1101 et seq. Under the Act, the Legislature provided for legalized slot machine gaming at a limited number of licensed facilities throughout the Commonwealth. 4 Pa.C.S. § 1102. The Act established the Board and gave it the "general and sole regulatory authority over the conduct of gaming or related activities as described in this part." 4 Pa.C.S. §§ 1201(a), 1202(a)(1). The Board is specifically empowered and obligated under the Act "to issue, approve, renew, revoke, suspend, condition or deny [the] issuance or renewal of slot machine licenses[,]" at its discretion. 4 Pa.C.S. § 1202(b)(12). The Legislature also created a Bureau of Investigations and Enforcement ("BIE") within the Board, but which "shall be independent of the board in matters relating to the enforcement of this part." 4 Pa.C.S. § 1517(a). The duties of the BIE include investigating and reviewing all applicants and applications for a license, permit, or registration. 4 Pa.C.S. § 1517(a.1)(2), (3).

Three categories of slot machines are authorized under the Act. 4 Pa.C.S. § 1301. A Category 1 license authorizes the placement and operation of slot machines at existing horse racing tracks; a Category 2 license authorizes the placement and operation of slot machines in stand-alone facilities; and a Category 3 license authorizes the placement and operation of slot machines in resort hotels. 4 Pa.C.S. §§ 1302–1305.

Within Category 2 licenses, the Board is authorized to award two facilities in a city of the first class, one facility in a city of the second class, and the remaining two facilities in a revenue- or tourism-enhanced location. 4 Pa.C.S. § 1304(a)(1). The Act further provides that Category 2 Licenses for revenue—or tourism-enhanced location cannot be given to two entities within 20 linear miles of each other or another Category 2 facility. 4 Pa.C.S. § 1304(b)(1).

The instant case involves the Board's approval of two Category 2 licenses to facilities in a revenue—or tourism-enhanced location. The applications within this subcategory were to be submitted to the Board by December 28, 2005. The Board then gave the applicants a "deemed completion date" of November 14, 2006, the date by which proposals were to be finalized. As of December of 2006, the Board had five applications pending before it under this subcategory.[1] The five applicants were Crossroads Gaming Resort & Spa, Mount Airy # 1 (hereafter "Mount Airy"), Pocono Manor Investors (hereafter "Pocono"), Sands Bethworks Gaming, and Tropicana Pennsylvania. After receiving the applications, the Board engaged in extensive review and investigation of the five applicants through the BIE and Bureau of Corporate Compliance and Internal Controls. During the course of its investigations, the bureaus submitted various reports to the Board detailing their findings as to each applicant, including the ownership structure of the proposed casinos, financial suitability of the applicant, the impact on the local areas, the location and zoning status of the facility, a review of key employee qualifiers, and the diversity plan. *See, e.g.,* R. 579a. The Board also held public input hearings related to the proposed facilities as well as permitted a public comment period. Consistent with its mandate, the BIE also conducted background investigations of the applicants, licensees, principals, key employees, or permittees of the proposed facilities. *See* 4 Pa.C.S. § 1202(b)(9). The background investigation and suitability

---

1. The Board originally received eight applications by the December 28, 2005 deadline. Three of these applications were either incomplete or withdrawn and were not included in the final hearings conducted by the Board.

report issued by the BIE raised questions concerning the character of the sole owner of Mount Airy, Louis DeNaples. Following the completion of the investigations, the Board conducted public sessions related to the licensing of Mount Airy on December 4–5, 2006. The purpose of the hearings was to provide the applicant with a final opportunity to demonstrate its suitability for the license. The Board also conducted closed executive sessions on December 4–6, 2006 related to the licensing of Mount Airy, at which time matters related to the suitability of Louis DeNaples were heard by the Board.

Following a review of the relevant law, the testimony and materials submitted to it, the public hearings, oral argument by the applicants, and closed executive sessions, the Board approved the Category 2 license applications for a revenue— or tourism-enhanced location of Sands Bethworks Gaming and Mount Airy on December 20, 2006 at an open public meeting. Subsequently, the Board filed an order approving the licenses as well as a published adjudication supporting its decision on February 1, 2007. In the published adjudication, the Board reiterated the relevant law that it used in making its determination. *See* Adjudication at 2–4; *see also* Public Hearing, 12/20/2006, at 33 (listing the relevant statutory provisions of the Act). The Board also explained that each Board member conducted a comprehensive evaluation of all information obtained throughout the entire licensing and investigative process and contained in the evidentiary record. Adjudication at 7; *see also* Public Hearing, 12/20/2006, at 25. The Board reviewed the process it followed in making its decision, including making requests for information from a number of law enforcement agencies, conducting database searches, conducting personal interviews, establishing a Financial Suitability Task Force, hiring an independent firm to review traffic study plans submitted by each of the applicants, conducting public input hearings, and providing the public with a public comment period. Adjudication at 8–16.

Following this extensive review, the Board made findings with regard to each applicant and concluded that all "five

applicants presented five eligible and suitable proposals for licensure under the Act in a thorough and professional manner. This meant that the Board was required to, and did, consider a multitude of factors related to the applicants and had to arrive at a decision in the exercise of its discretion as to which two of the five suitable applicants should receive the licenses." *Id.* at 111; *see also* Public Hearing, 12/20/2006, 32–33. The Board had previously noted that because of the fact that all five applicants were suitable, they considered which proposals best served the Commonwealth's and public's interests in making its decision. Adjudication at 6; *see also* Public Hearing, 12/20/2006, at 33.

In choosing Mount Airy, the Board offered the following statement:

Among the remaining sites, the Board believes based upon its review of the evidence that the Mount Airy Proposal will also best serve the objectives of the Act and should be granted a Category 2 license. The location of Mount Airy in the Pocono Mountains will provide a location conducive to economic development and gaming without overburdening local services. The design of the facility is consistent with the local atmosphere and region and it promises to restore the once-famed Mount Airy Lodge to the Pocono Mountains, which will enhance the draw of tourists to the region and generate gaming revenue for the Commonwealth. The Mount Airy structure is presently under construction, other approvals have been obtained and the prospect of bringing gaming to the Poconos is accelerated substantially over any other proposal. As such, the economic benefits will flow to Pennsylvania's citizens sooner for the betterment of the Commonwealth. Furthermore, in comparing to other applicants, the fact that Mount Airy is locally owned by a lifelong resident of the area who has demonstrated a lifetime commitment to the development of businesses in the area and the growth of the community through his charitable endeavors, is seen as a positive factor for Mount Airy since the profits from the venture will remain in Pennsylvania as an

asset to other economic development and community commitments.

*Id.* at 112. Furthermore, in making its final determination, the Board specifically noted that it was limited by 4 Pa.C.S. § 1304(b), which placed a mileage limitation on the location of the facilities. Thus, it could only award a license to Mount Airy *or* Pocono. Adjudication at 113 (emphasis added).

Following the Adjudication, Pocono filed a Petition for Review with this Court raising a number of issues.[2] Mount Airy intervened in this matter under Pa.R.A.P. 1531.[3] Each of the issues will be addressed seriatim. We turn first, however, to this Court's standard of review that is specifically prescribed by the Legislature under the Act.

The Legislature provided the Pennsylvania Supreme Court "with exclusive appellate jurisdiction to consider appeals of any final order, determination or decision of the board involving the approval, issuance, denial or conditioning of a slot machine license. . . ." 4 Pa.C.S. § 1204. Furthermore, under this statute, our review is limited as follows:

Notwithstanding the provisions of 2 Pa.C.S. Ch. 7 Subch. A (relating to judicial review of Commonwealth agency action) and 42 Pa.C.S. § 763 (relating to direct appeals from government agencies), the Supreme Court shall affirm all final orders, determinations or decisions of the board involving the approval, issuance, denial or conditioning of a slot machine license unless it shall find that the board committed an error of law or that the order, determination or

**2.** Pocono also filed a Motion for Clarification of Contents of Certified Record, Immediate Access to the Records, and Request for Evidentiary Hearing. This motion was disposed of by court order dated March 14, 2007, which granted the parties access to certain documents. The request for an evidentiary hearing was denied. The Board and Mount Airy filed motions requesting this court order Pocono to post a bond in this matter. These motions were denied on March 29, 2007. Finally, Mount Airy filed a Speaking Application for Summary Relief, which was denied by this court on March 30, 2007.

**3.** Sands Bethworks, LLC. also intervened in this matter pointing out that the outcome of the present appeal should have no effect on the approval of the license to Sands.

decision of the board was arbitrary and there was a capricious disregard of the evidence.

*Id.* Therefore, under § 1204, our review is limited to determining whether the Board: (1) erred as a matter of law; or (2) acted arbitrarily and in capricious disregard of the evidence.

With regard to an error of law, our standard of review is *de novo* and our scope of review is plenary. *Buffalo Twp. v. Jones,* 571 Pa. 637, 813 A.2d 659 (2002). Alternatively, regarding the "arbitrary" and "capricious" standard, our case law defines a capricious disregard of the evidence to exist "when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result." *Arena v. Packaging Systems Corp.,* 510 Pa. 34, 507 A.2d 18, 20 (1986); *see also Leon E. Wintermyer, Inc. v. WCAB (Marlowe),* 571 Pa. 189, 812 A.2d 478 (2002). Furthermore, under the capricious disregard standard an agency's determination is given great deference, and relief will rarely be warranted. *Wintermyer,* 812 A.2d at 484.[4] Under this standard, an appellate tribunal is not to substitute its judgment for that of the lower tribunal and the standard "is not to be applied in such a manner as would intrude upon the agency's fact-finding role and discretionary decision-making authority." *Id.* at 487–88. Keeping these standards in mind, we turn to Pocono's arguments.

Pocono first argues that the Board provided procedural advantages to Mount Airy by declining to enforce deadlines. Specifically, Pocono contends that Mount Airy was not required to adhere to deadlines for submitting its "operating structure" of Mount Airy or the physical proposal of the

**4.** Although the parties in the instant case do not raise a challenge to our use of the *Wintermyer* decision, we acknowledge that such a claim has been raised in a separate matter. The claim is that *Wintermyer* cannot be used in defining capricious disregard since § 1204 of the Act specifically excludes § 704 of the Administrative Agency Law from the standard of review and *Wintermyer* was based upon the interpretation of § 704. We reject this argument. *Wintermyer's* articulation of general concepts regarding the capricious disregard standard is applicable as such general statements would apply to any discussion of the capricious disregard standard.

project. Likewise, Mount Airy was permitted to make a last minute substitution of an unidentified "audit committee" to the Board, at which time no further investigation could occur. Pocono also contends that Mount Airy was not required to release documents that would serve as the basis for a valid comparison to be performed under 58 Pa.Code § 441.19(j). Pocono concludes that these procedural advantages gave Mount Airy an unfair advantage over Pocono.

The Board and Mount Airy respond that these procedural objections were waived by Pocono's failure to raise them before the Board. *See Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114, 116–17 (1974). Accordingly, we must turn first to the effect of *Dilliplaine* on the instant proceedings. As this raises a question of law, our standard of review is *de novo. Buffalo Twp., supra.*

In *Dilliplaine,* this court rejected the concept of basic and fundamental error in the modern judiciary making clear that the general policy was that no question would be heard by an appellate court that was not objected to and raised before the lower court. The purpose of requiring such an objection was to ensure that the lower tribunal had the first opportunity to correct any such alleged error as well as providing an efficient use of judicial resources. *Dilliplaine,* 322 A.2d at 116–17. Such reasoning was extended to administrative agencies, like unemployment compensation proceedings, in *Wing v. Unemployment Comp. Bd. of Review,* 496 Pa. 113, 436 A.2d 179, 181 (1981) (providing that "the administrative law tribunal must be given the opportunity to correct its errors as early as possible; diligent preparation and effective advocacy before the tribunal must be encouraged by requiring the parties to develop complete records and advance all legal theories; and the finality of the lower tribunals' determinations must not be eroded by treating each determination as part of a sequence of piecemeal adjudications"). Pa.R.A.P. 1551 represents a codification of this case law relating to petitions for review and provides that "[n]o question shall be heard or considered by the court which was not raised before the government unit except: (3) Questions which the court is satisfied that the petitioner could not

by the exercise of due diligence have raised before the government unit." Pa.R.A.P. 1551(a)(3); *see also Goods v. Pennsylvania Board of Probation & Parole*, 590 Pa. 132, 912 A.2d 226 (2006) (holding that, while *Dilliplaine* waiver may be utilized in the administrative context, it does not apply to administrative proceedings absent statute or regulation providing for preservation and waiver within the administrative framework).

█ In this case, the Board argues that Pocono had the opportunity to raise objections, but failed to do so. Specifically, the Board points out that Pocono was present at the December 5th Mount Airy hearing, but said nothing. Furthermore, the Board asserts that Pocono's failure to file written objections between the December 5th public hearing on Mount Airy's application and the December 19th final hearing before the Board operated as a waiver of these issues.[5] The Board also relies on Pocono's failure to raise any such objections during the December 19th oral argument, at which time all of the applicants were given the opportunity to make a final plea. Finally, the Board points to its Adjudication, wherein it stated that "[n]o applicant filed any written objection to the Board docket, or raised any objection orally or in writing to the Board during the course of its hearing, relating to the procedure utilized by the Board for the conduct of the hearing process generally or to any particular allegation of error." Adjudication at 16, ¶ 40. Based upon these failures, the Board concludes that Pocono waived any challenges to the procedures the Board followed in evaluating Mount Airy's application. Notably absent from the Board's argument, however, is whether the Act permitted Pocono to participate in the Mount Airy hearing or the Board's regulations by which Pocono could have raised objections regarding the Mount Airy proceedings. Thus, while the Board proposes

5. In its Post–Hearing Brief submitted on December 19, 2006, Pocono alludes to some of the same complaints raised herein. R. 1014a–15a (alleging that Mount Airy failed to be as open as Pocono and that Mount Airy failed to comply with the Board's deadline and revised its proposal at the "eleventh hour"). We need not, however, decide whether such allegations were sufficient to preserve Pocono's objections, because we conclude that the rule of *Dilliplaine* does not preclude us from considering Pocono's objections as discussed herein.

various avenues by which an applicant could have raised a challenge to the procedures the Board followed in another applicant's case, we do not know how Pocono would have been aware that these avenues for raising objections existed.

The instant licensing proceedings are distinct from any other proceedings in this Commonwealth, indeed, they are *sui generis*. Certainly, the proceedings before the Board are not a trial, nor are they akin to unemployment or workers compensation proceedings. In fact, they are not even akin to the most recent Harness Racing licensing procedures when the State Harness Racing Commission made clear that the pool of applicants would considered as a group. 7 Pa.Code § 133.4. Moreover, the regulation promulgated under the Race Horse Industry Reform Act is clear that objections with respect to the conduct of a hearing, including objections to the introduction of evidence, must be made orally and included in the record of the hearing. *See* 58 Pa.Code § 185.83(*o*).

In the gaming context, however, while the proceedings of all applicants are related because the parties are all vying for the same thing, i.e., the award of a gaming license, there are also many times when the Board deals only with the individual applicant. The other applicants are not necessarily privy to such one-on-one interactions with the Board. Indeed, although the Board asserts that Pocono could have raised an objection since it was present at the December 5th proceedings, other than the Board's argument, we are unsure that if Pocono had raised such an objection it would have been recognized.[6] The applicants that were denied a license must be given an opportunity to challenge the Board's decision, since the Act provides as much under § 1204. And, in the absence of any mechanism for raising such challenges during the pendency of the proceedings, combined with the fact that the reviewing process for each individual application runs largely parallel to those of the other applicants rather than being considered as a single group, we find no support for the

6. From the quality and quantity of counsel involved in this case, we cannot imagine that counsel would not have objected to perceived procedural irregularities if he or she believed it was necessary to do so.

Board's waiver argument. Again, we stress that the Board has not pointed this court to anything reassuring us that Pocono had a way in which to lodge such objections to the Mount Airy proceeding that the Board would have recognized. Of course, the Board is free to adopt such procedures going forward.[7] At this juncture, however, we are unsatisfied that Petitioner could have raised these issues before the Board under Pa.R.A.P. 1551(a)(3), and hold that *Dilliplaine* and its progeny do not apply to Board proceedings as they currently exist.[8]

Relevant to this issue, Mount Airy argues that Pocono could have sought to have its record reopened under 58 Pa.Code § 494.6 if it believed that Mount Airy's final proposal constituted "material changes of fact." The relevant regulation provides that after the conclusion of a hearing, a participant may seek to reopen the record for taking additional evidence. 58 Pa.Code § 494.6. "The petition must set forth clearly the facts claimed to constitute grounds requiring reopening of the proceeding, including material changes of fact or law alleged to have occurred since the hearing was concluded." *Id.* Similar to the analysis above, however, we read this regulation as providing an applicant the opportunity to reopen the proceedings relevant to its application. We do not read this regulation as providing an opportunity for an applicant to seek to reopen the proceedings related to a different applicant. Accordingly, we turn to the specific procedural claims raised by Pocono.

Pocono raises a series of arguments that the Board's failure to follow its own deadlines and procedures rendered

---

**7.** Furthermore, we encourage the Board to adopt a procedure for lodging procedural objections akin to the complaints by Pocono. As demonstrated by the analysis that we undertake in this case, it would have been beneficial to have a decision by the Board rather than relying on statements made by the Board in its responsive Brief before this court.

**8.** The Board also argues that Pocono did not comply with Pa.R.A.P. 2117(c) and 2119(e), which require the party to point to the portion of the record preserving the issue for appeal. As our conclusion today is that Pocono was not required to comply with *Dilliplaine,* these Rules do not apply.

the process fundamentally unfair. As the Board does not argue that it was within its discretion to ignore such deadlines and procedures, we deem the claims akin to a challenge to procedural due process. As such, they are best reviewed as errors of law. Accordingly, our standard of review is *de novo* and our scope of review is plenary. *Buffalo Twp., supra.*

The first claim alleges that the Board failed to require Mount Airy to adhere to the Board's October 13th deadline governing the final submission of the applicant's ownership structure. *See* R. 178a. In reality, however, Pocono's objection must be that Mount Airy was allowed to make last minute changes to its organizational structure, since the ownership structure had never changed—Louis DeNaples was always and continues to be the sole owner of Mount Airy. Accordingly, any reference to the October 13th deadline is misplaced.

Instead, we read Pocono's argument as alleging that Mount Airy was allowed to change the organizational structure at the last minute. Pocono asserts that the idea of an "unnamed audit committee" to manage the facility was introduced for the first time at the December 19th hearing. Pocono implies that this last minute change was to marginalize the presence of Mr. DeNaples in the management of the operation and was inconsistent with prior representations by Mount Airy that Mr. DeNaples would be involved in the day-to-day management of the facility. Pocono contends that this last minute change was procedurally unfair and more importantly, meant that no background investigation of the members of the audit committee occurred. Likewise, Pocono implies that Mount Airy was permitted to make additions to personnel at the December 5th hearing, including Paul Henderson, Jules Sieburgh, and Jim McCarthy.

We find Pocono's assertions to be specious. There was no question that an "audit committee" was identified as overseeing certain operations of the facility on the organizational chart that was submitted with the Mount Airy December 21, 2005 application. Furthermore, Mount Airy's prior representations that DeNaples would be "in his truck driving over, saying what's going on, how are things going ...," or the fact

that he would retain some power to hire and fire employees, certainly did not amount to asserting that DeNaples would be managing the day-to-day operations of the facility. Indeed, contrary to Pocono's assertions, key employees of Mount Airy were identified and investigated well before the November 14th "deemed completion date." *See* R. 10a, Application Summary of Mount Airy # 1, including a list of supplemental applications sent to the Board, including the application of Paul Henderson, dated 6/23/2006 [9]; R. 239b (filed under seal) Letter to the Board dated 11/13/2006, listing the credentials of members of the Mount Airy management team, including James McCarthy (consultant) and Jules Sieburgh, Director of Information Technology. Simply stated, Pocono's assertions in this regard are unsupported by the record.

Pocono next argues that the Board provided procedural advantages to Mount Airy by permitting it to make changes to the physical design of its proposal following the November 14, 2006 "deemed completion date." Specifically, Pocono asserts that Phase I of the project had grown to include a 400–room hotel, an additional stand-alone parking garage, as well as a new 31,000 square foot retail bridge. Likewise, Phase II was expanded to include two sub-phases (A & B). Phase IIA included an additional 2,000 slot machines, 1,172 additional food and beverage seats, and an additional 1,200 parking spaces. Phase IIB included an additional 3,400 parking spaces, an additional 41,500 square feet of retail space, and a conference and banquet facility of 174,000 square feet. In support of its challenge, Pocono points to a statement by a Board member at the December 5th public session raising concerns that the scope of Mount Airy proposal was much larger than that previously submitted. R. 916a. Pocono also points to a similar statement made by the Board's traffic consultant at that same hearing who stated that the traffic studies that were done did not "appear to be entirely consistent with what was presented here today." R. 933a.

9. Indeed, we find any claim related to Paul Henderson to be particularly dubious, since he was investigated by the BIE and appears as a "key employee" in the BIE's suitability report.

In this case, the Board established a "deemed completion date" of November 14, 2006 pursuant to 4 Pa.C.S. § 1301. *See also* 58 Pa.Code § 441.2 ("[T]he Board will set a completion date by which all filed applications are to be deemed complete by the Board.) The Board notified the parties of the deemed completion date by letter dated October 4, 2006. In the October 4th letter to the parties, the Board explained the effect of the deemed completion date as triggering a twelve-month deadline within which all applications must be decided, and closing the record unless the applicant obtained prior Board approval to submit additional evidence. R. 179a. The letter further explained that the Board would continue to have 'authority to request information from an applicant at any time prior to licensure. When received, such information will be incorporated into the appropriate application, even if the information was requested subsequent to the deemed complete date.' " *Id.*

The Act refers to a "deemed completion date," 4 Pa.C.S. § 1301, and the regulations supplement the Act by requiring the Board to set such a date, 58 Pa.Code § 441.2. Neither the Act nor regulations, however, explain the effect of the "deemed completion date," except to state that the deemed completion date triggers the running of the twelve-month period within which applications must be approved or denied. 4 Pa.C.S. § 1301. While the Board viewed the "deemed completion date" as the date final proposals would be received from the applicants, the October 4th letter sent to the applicants establishes that the Board envisioned that further evidence would be taken on an as needed basis and such evidence would be made part of the record. R. 179a. Therefore, we conclude that the Board viewed the process as more fluid than Pocono is willing to acknowledge. Clearly, by the verbiage of the October 4th letter, the Board believed that the process would include an ongoing dialogue between itself and the applicant, which included the submission of additional material as necessary beyond the "deemed completion date." Accordingly, we reject Pocono's broad assertion that the Board

committed a procedural error in taking additional evidence from Mount Airy beyond the "deemed completion date."

More importantly, however, the record supports the Board's contentions that the scope of the Mount Airy plan did not change following the "deemed completion date." Rather, as the Board points out, the construction schedule may have changed at the December 5th hearing due to financing commitments, but the scope of the project had remained largely consistent. Significantly, the original application submitted to the Board represented that Phase I would contain a 198–room hotel and Phase II would add another 200 + rooms. Thus, Mount Airy always envisioned that a 400–room hotel would be constructed, but by November of 2006, Mount Airy proposed to construct a 400–room facility in Phase I rather than spreading the construction over two phases. *See* R. 235b, Letter to Board dated November 9, 2006, reflecting 401 rooms to be built in Phase I. Likewise, the original application proposed a total of 5,000 slot machines by Phase II.

Furthermore, Mount Airy's November 13th letter to the Board, which was submitted before the "deemed completion date," speaks volumes. In that letter, it represented:

Mt. Airy is not building a temporary casino. Mt. Airy broke ground on the construction of its permanent facility on July 17, 2006. To date, foundations have been poured and the erection of steel has commenced. It is anticipated that Phase I will be completed by December, 2007 with the casino opening in October 2007 and the hotel opening, initially with 200 rooms, in November 2007. Construction will continue, upon opening of the facility in December of 2007, without interruption. Upon completion in December 2008, the expansion will include an additional 200 hotel rooms (400 total), additional gaming and support areas to accommodate up to 3,500 slot machines, a retail bridge, and a parking facility for 1,100 vehicles.

R. 243b. In that same letter, Mount Airy included a list of other planned amenities as follows:

- 400 room Luxury Hotel
- Food Service (a narrative describing the planned restaurants is attached as Exhibit 2(g)(1))

* Buffet 440 seats
* Diner 142 seats
* Italian 103 seats
* Steakhouse 105 seats
- 14,500 SF Spa to be operated by WTS International (a narrative describing the Spa and biography of WTS is attached as Exhibit 2(g)(2))
- Lounge/Entertainment
 * Casino Bar 42 seats
 * Entertainment Lounge 275 seats
 * VIP Lounge 130 seats
- Parking 2,806 spaces
- Retail stores
- Meeting Facilities

The Phase 2 expansion will include the following elements: an Asian themed restaurant, Spanish/Mexican restaurant, a food court and roughly double seating capacity of the buffet; additional lounge/entertainment facilities; a 174,000 SF conference center; 31,500 SF of additional retail space; and expanded parking facilities, including a 3,400 space parking garage.

R. 246b–47b; *see also* Letter to Board dated November 9, 2006, representing that there would be an additional 1,170 seats for food and banquet, 4,600 additional parking spaces, and 41,500 square feet of retail space in Phase II. Indeed, while questions were raised at the December 5th hearing regarding whether the scope of the Mount Airy project had significantly changed, Pocono glosses over Mount Airy's response to the Board members' question, which was that the "original plan had the same amount of amenities in the hotel and the casino . . . ." R. 917a. Likewise, the Board's traffic consultant did not note any specific concerns that were raised by the December 5th Mount Airy proposal, but merely noted that there "may need to be some further evaluation as to the scope of [the] improvements with Penn DOT." R. 933a. These sentiments were reflected in the Board's Adjudication wherein it noted, "[t]here were several items that, in the opinion of the McCormick Taylor engineer, required further evaluation. Mount Airy has committed to resolving all the remaining issues related to traffic mitigation." Adjudication at 85. Thus, while the timing of when construction of certain facilities ultimately may have changed, there can be no doubt that the

scope of the project was fully anticipated by the November 14th "deemed completion date."

 Pocono's final contention under this issue is that Mount Airy failed to comply with the Board's regulations regarding comparative evidence.[10] In this case, Pocono filed a Right to Know request for economic impact information relative to Mount Airy's proposal on June 1, 2006. This matter was ultimately decided by the Board's Right to Know Law Exceptions Unit (hereafter "Exceptions Unit"), which denied the request in total under the confidentiality provisions of the Act. Pocono argues that the Exceptions Unit ruling thwarted its right to present a valid comparison under 58 Pa.Code § 441.19(j) and (o). Furthermore, Pocono asserts that allowing Mount Airy to withhold such information ignores agency law, since it is well settled that in an agency proceeding each party must have the opportunity to know of the claims of the opponent, cross-examine witnesses, and introduce evidence on its own behalf. *Somerset Mental Retardation Unit v. Sanders*, 85 Pa.Cmwlth. 549, 483 A.2d 1018, 1020 (1984). Pocono argues that it was not given the opportunity to be heard in this matter and present relevant comparative evidence as provided for in 58 Pa.Code § 441.19(o), because it was given limited information regarding Mount Airy's proposal and no notice of the expanded proposal.

In response to Pocono, the Board points out that Pocono's request and the subsequent determinations made by the Exceptions Unit are independent of the application process and as such, are not reflected on the Board's docket. The Board contends that the proper way to challenge the Exceptions Unit decision was to the Commonwealth Court under the Right to Know Law.

Ultimately, however, we do not read Pocono's challenge so much as opposing the Board's determination under the Right

**10.** To the extent that Pocono contends that Mount Airy failed to comply with the disclosure requirements, we do not see how Mount Airy erred in this regard, as it was the Board that decided what information Mount Airy was required to disclose following Pocono's request for information.

to Know Law, but as arguing that their opportunity to present comparative evidence was rendered meaningless in this case because of the confidentiality provisions of the Act, coupled with the fact that Mount Airy was allowed to make modifications to its physical proposal at the last minute. Indeed, Pocono states as much when it summarizes its argument that it was never "given the opportunity to examine evidence, cross-examine witnesses or the opportunity to be heard through comparative argument after disclosure of the Mount Airy evidence." Brief in Support of Petition for Review at 26–27.

While we agree with Pocono's recitation of due process for purposes of agency law, we reject its attempt to import these concepts wholesale into the comparative evidence process provided for by the gaming regulations, since such a process is necessarily limited by the legislative grant of authority to the Board. Moreover, in order to accept Pocono's arguments, we would have to read the Board's regulation regarding comparative evidence in such a way as to be inconsistent with the legislative mandate regarding confidentiality and the Right to Know Law. We refuse to do so.

We presume, as we do with all statutes, that the Board intended its regulations to be constitutional. *Cf.* 1 Pa.C.S. § 1922(3). The relevant Gaming regulations give Category 2 applicants the opportunity to present comparative evidence between the applicant and other applicants in the same category at the hearing before the Board. 58 Pa.Code § 441.19(a)(4). Consistent with this regulation, an applicant is required to provide certain information to other applicants in the same licensing subcategory. 58 Pa.Code § 441.19(j), (o). This information includes requiring the applicant to identify "all evidence it intends to use to support its presentation before the Board," all experts and witnesses and a summary of the testimony, as well as offering a copy of each document to be proffered. *Id.*

Those regulations, however, must be consistent with the legislative authority given to the Board by the Legislature.

*See, e.g., Popowsky v. Pennsylvania Public Utility Comm'n,* 589 Pa. 605, 910 A.2d 38, 52 (2006). As noted previously, the Board was created by the Legislature. The Legislature also prescribed the responsibilities and the duties, as well as the general and specific powers of the Board. *See, e.g.,* 4 Pa.C.S. §§ 1201, 1202. While the Board was given the broad "sole regulatory authority over every aspect of the authorization and acquisition of slot machines under § 1202(a)(1)," such authority is limited by other sections of the Act, including the legislative restriction regarding the confidentiality of documents.

The Legislature provided for confidentiality of certain information as follows:

All information submitted by an applicant pursuant to section 1310(a) (relating to slot machine license application character requirements) or obtained by the board or the bureau as part of a background investigation from any source shall be considered confidential. Except as provided in section 1517(f) (relating to investigation and enforcement), the information shall be withheld from public disclosure in whole or in part, except that any information shall be released upon the lawful order of a court of competent jurisdiction or, with the approval of the Attorney General, to a duly authorized law enforcement agency or shall be released to the public, in whole or in part, to the extent that such release is requested by an applicant and does not otherwise contain confidential information about another person. The board may not require any applicant to waive any confidentiality provided for in this subsection as a condition for the approval of a license or other action of the board. Any person who violates this subsection shall be administratively disciplined by discharge, suspension or other formal disciplinary action as the board deems appropriate.

4 Pa.C.S. § 1206(f). The Act also requires the Board to "restrict access to confidential information in the possession of the board which has been obtained under this part and ensure that the confidentiality of information is maintained and pro-

tected. Records shall be retained by the board for seven years." 4 Pa.C.S. § 1207. The regulations further define confidential information and include as confidential:

(i) Background investigation information, including all information provided under section 1310(a) of the act (relating to slot machine license application character requirements), submitted in connection with an application required for the issuance of any license or permit under this part, Board rules, discovery procedures or cross-examination or that is provided as a courtesy to a party in a formal proceeding received by the Board or the Department as well as records obtained or developed by the Board or the Department as part of an investigation related to an applicant, licensee or permittee containing any of the following:

(A) Personal information, including home addresses, telephone numbers, Social Security numbers, educational records, memberships, medical records, tax returns and declarations, actual or proposed compensation, financial records, memberships, credit-worthiness, or financial condition relating to an applicant, licensee or permittee or the immediate family thereof.

(B) Documents and information relating to proprietary information, trade secrets, patents or exclusive licenses, architectural and engineering plans and information relating to competitive marketing materials and strategy which may include customer-identifying information or customer prospects for services subject to competition.

(C) Security information including risk prevention plans, detection and countermeasures, emergency management plans, security and surveillance plans, equipment and usage protocols, and theft and fraud prevention plans and countermeasures.

(D) Information with respect to which there is a reasonable possibility that public release or inspection of the information would constitute an unwarranted invasion into personal privacy as determined by the Board.

(E) Records or information that is designated confidential by statute or the Board.

(F) Records of an applicant or licensee not required to be filed with the United States Securities and Exchange Commission by issuers that either have securities registered under the Securities Exchange Act of 1934 (15 U.S.C.A. § 781) or are required to file reports under section 15D of that act (15 U.S.C.A. § 78o–6).

(G) Records considered nonpublic matters or information by the United States Securities and Exchange Commission as provided by 17 CFR 200.80 (relating to Commission records and information).

(ii) *Exceptions.* Notwithstanding anything contained in subparagraph (i) to the contrary:

(A) Records containing information received by the Board or the Department or information obtained and developed as part of an investigation related to the applicant, licensee or permittee may be disclosed to State or Federal law enforcement agencies or entities when the Attorney General or a court of competent jurisdiction determines that the information contains evidence of a possible violation of laws, rules or regulations enforced by those agencies or entities.

(B) Records from an applicant, licensee or permittee may be disclosed to the applicant, licensee or permittee upon written request. Records from applicant, licensee or permittee may be disclosed to a person with the written consent of the applicant, licensee or permittee.

(C) Records containing information from an applicant, licensee or permittee that is already in the public domain or subsequently becomes a part of the public domain by an action taken by the applicant, licensee or permittee is not subject to the confidentiality requirement set forth in subparagraph (i).

58 Pa.Code § 401.4. Thus, considering the relevant statutes and regulations, when a request is made for access to another applicant's information for purposes of comparison under 58 Pa.Code § 441.19(j) and (o), the Board must determine whether the documents are subject to the confidentiality provisions of the Act. The Board is without authority to order disclosure

of documents that are specifically required to be maintained and protected as confidential under the Act. *Popowsky, supra.*

Pocono next raises a series of challenges to the discretionary aspects of the Board's decision. As noted previously, the Board found all five applicants to be suitable, but then had the unenviable task of choosing between those five qualified applicants to determine which proposals would best achieve the legislative intent, including which proposal would serve the Commonwealth's and public's interests. *See* Adjudication at 6; *see, e.g.,* 4 Pa.C.S. § 1102(10).

The Legislature vested the Board with broad discretion in approving an applicant once the applicant was determined to be eligible. *See* 4 Pa.C.S. § 1325. It also enumerated a number of factors the Board "may also take into account" when considering an application, but did not place any emphasis on one consideration over another or even mandate that the Board consider each of the factors before awarding the license. *See* 4 Pa.C.S. § 1325(c). In other words, once the eligibility requirements were met by the applicant, the Board had almost complete discretion to approve or deny a license, subject only to this court's limited review under § 1204. Ignoring the broad discretion that was entrusted to the Board, Pocono argues that the Board gave weight to certain facts regarding Mount Airy, but did not give weight to similar facts in the Pocono proposal. Pocono frames this issue in terms of the Board's capricious disregard of the evidence.

As noted previously, under the capricious disregard standard, an appellate tribunal is not to substitute its judgment for that of the lower tribunal and the standard "is not to be applied in such a manner as would intrude upon the agency's fact-finding role and discretionary decision-making authority." *Wintermyer,* 812 A.2d at 488. Yet, it is clear that Pocono is asking this court to intrude upon the discretionary decision-making of the Board, a task that is not properly ours. Nevertheless, we turn briefly to the specific complaints that are raised by Pocono.

 Pocono first contends that the Board calculated the Mount Airy financial projections on 5,000 slot machines, but erroneously only used 3,000 for Pocono. According to Pocono, reliance on this projection amounted to a capricious disregard of the evidence, since Pocono's proposal always included 5,000 slot machines.

In its Adjudication, the Board explained that the Financial Suitability Task Force conducted a "drive-time analysis" for each facility, which included estimating the gaming revenues of the applicant's proposed facility for a stabilized year of operation. Adjudication at 12, Finding of Fact 18. In its analysis of the various proposals, the Board noted that the Task Force projections for Pocono were "substantially lower" than the projections for the other applicants. Adjudication at 94. The Board also noted with concern that Pocono's own projections were significantly higher than the Task Force projections. *Id.* at 95. Regarding review of Pocono's revenue generation, the Board stated,

If the Pocono Manor revenues were less than they have projected and closer to the Task Force estimates, revenues to the Commonwealth would be greatly diminished. This is a risk the Board is not willing to take given its responsibilities under the Act to generate revenues for the Commonwealth, especially given the presence of other applicants in this competitive process who are, as established by credible evidence, likely to produce more for the Commonwealth.

*Id.*

While the Board clearly considered the Task Force estimates in reviewing the various applicants' proposals,[11] Pocono overlooks that the Task Force used a "stabilized year" in projecting results for each applicant. *See infra* referring to Finding of Fact 18. That year was the fifth year that the facility would be operational. *See, e.g.,* R. 1690a, 1221a (projections based upon year 5 for both casinos). Indeed, the Task Force Report reflects that Pocono also estimated its revenues

11. We also stress that this was merely one of many considerations the Board made. From the Board's Adjudication, it is clear that no one consideration directed the choice of Mount Airy instead of Pocono.

based on 3,000 machines for the stabilized year. R. 1033a. Similarly, Pocono's estimates offered at the hearing were based on 3,000 slot machines.[12] R. 756a. Accordingly, Pocono has not shown that the Board capriciously disregarded the evidence before it.

 Pocono next argues that the Board gave weight to the fact that Mount Airy could be operational soon, while not acknowledging that Pocono was currently operational and would have been open almost a year before Mount Airy.

Pocono mischaracterizes the Board's determination, since the Board focused on the fact that Mount Airy was going to be operational with more slots (2,500) in a **permanent** facility earlier than Pocono. *See* Adjudication at 97. The Adjudication specifically acknowledged that Pocono would be generating some revenue by the end of 2007, but noted that Pocono would not have 3,000 slot machines in a permanent facility until 2009 as follows:

Presuming the licenses were issued in the January 2007 time period, the applicants predicted they could open in this order: Mount Airy, 2,500 machines in October 2007; Tropicana, 3,000 machines in December 2007; Pocono Manor, 1,500 machines in a temporary facility by December 31, 2007 and 3,000 machines by January 2009; Sands Bethworks, 3,000 machines in July 2008; and Crossroads, 3,000 machines in January 2009. Assuming a worst case scenario that the market in these locales could only support 3,000 machines, the time frame which Crossroads projects the receipt of any tax benefit to the citizens of Pennsylvania is too far off in the opinion of the Board when compared to the other applicants. The Mount Airy and Tropicana projects promise the most revenue the soonest, with the staggered opening of Pocono Manor providing some revenue at the end of 2007, but not increasing those revenues based on

12. In fact, unlike the prior claims, when we concluded that objections to alleged unfair procedural advantages to the Mount Airy proceeding were not waived, we are very concerned that Pocono acquiesced in the Task Force's projections at the December 5th hearing, R. 756a–57a, but now seeks to complain about those very same numbers.

3,000 machines until 2009. . . . Because the Board has an interest in the Casino's opening and providing revenues for the Commonwealth, the earlier opening dates **of the full permanent facilities** of Mount Airy, Tropicana, and to a lesser degree Sands Bethworks, favors [sic] those applicants for licensure.

*Id.* at 96–97 (emphasis added). Thus, the Board did not disregard the evidence Pocono offered, but concluded that the earlier opening dates of the **full permanent facilities** of Mount Airy and Tropicana favored those applicants, since they would "provide the most revenues the soonest." *Id.* Consideration of such factors are expressly envisioned by the Act, 4 Pa.C.S. § 1102(3), and are discretionary by the Board. Pocono has failed to establish that the Board capriciously disregarded any evidence before it.

 Pocono next argues that the Board capriciously disregarded evidence of Pocono's superior location and the testimony by its own traffic consultant. The Board found that both Mount Airy and Pocono were suitably located and that location did not give an advantage to either applicant. Adjudication at 84. In fact, the Board found the Allentown/Bethlehem location to be superior to any of the other proposed locations. *Id.* at 83. Similar to location, with regard to the traffic studies, the Board found that "no insurmountable traffic mitigation barriers have been identified which would preclude a site for consideration." *Id.* at 87. Moreover, as discussed under the prior issue, the Board noted the concerns that were raised by the Mount Airy traffic study, but concluded "Mount Airy has committed to resolving all remaining issues related to traffic consideration." *Id.* at 85. Clearly, the weight to be given to the traffic studies, proposed site location, and the parties' response to any concerns raised by the studies were within the discretion of the Board. Pocono has failed to establish that the Board capriciously disregarded any evidence of record.

 Finally, Pocono contends that the Board capriciously disregarded evidence of Pocono's superior financial commit-

ment and job creation. Again, however, the Board found that both proposals were financially suitable. Adjudication at 99. In fact, the Board specifically noted that the economic impact of Sands, Mount Airy, and Pocono, "will be broader in scale than Crossroads and Tropicana" due to the size of their economic commitments. *Id.* at 99 n. 9. Likewise, the Board merely questioned the amount of jobs that Pocono was proposing to create, based upon the fact that it was nearly twice the number proposed by the other five applicants. Thus, the Board decided not to give Pocono's job estimates any "great weight," but it was given the same amount of weight as the other applicants' estimates. Again, such considerations were within the discretion of the Board, and Pocono has failed to establish that the Board disregarded any evidence of record.[13]

 Pocono's next challenge involves the Board's determination that Mount Airy met the character suitability requirement as set forth in 4 Pa.C.S. § 1310(a). While most of the information relevant to this claim continues to be confidential under 4 Pa.C.S. § 1206(f), because it relates to slot machine license application character requirements, we can fully discuss the legal claim raised by Pocono as well as analyze the claim in a general manner.

Of special concern to the Legislature was that gaming would not be perceived as corrupt in this Commonwealth. 4 Pa.C.S. § 1102(11). Consistent with this concern, the Legislature enacted several eligibility provisions, which limit the Board's authority to issue licenses only to those applicants that it deemed were of good character, integrity, and honesty. Under 4 Pa.C.S. § 1202(b)(23), "[t]he board shall not issue or renew a license or permit unless it is satisfied that the

---

**13.** In two sentences, Pocono also asserts that the Board misstated that Pocono did not have local approvals and capriciously disregarded Pocono's evidence of community commitments. Again, however, the Board did not deny Pocono's license on the basis that it did not have local approval and reviewed the community commitment of Pocono concluding that no applicant's community commitments were "significantly better than another that would sway the Board to consider this criteria as a substantial factor in choosing one applicant over another." *See* Adjudication at 103–04. Pocono has not established that the Board capriciously disregarded any evidence of record.

applicant is a person of good character, honesty and integrity and is a person whose prior activities, criminal record, if any, reputation, habits and associations do not pose a threat to the public interest or the effective regulation and control of slot machine operations or create or enhance the danger of unsuitable, unfair or illegal practices, methods and activities in the conduct of slot machine operations or the carrying on of the business and financial arrangements incidental thereto." Section 1310(a) then expands on this concept by requiring that:

> Every application for a slot machine license shall include such information, documentation and assurances as may be *required to establish by clear and convincing evidence the applicant's good character, honesty and integrity.* Information shall include, without limitation, information pertaining to family, habits, character, reputation, criminal history background, business activities, financial affairs and business, professional and personal associates, covering at least the ten-year period immediately preceding the filing date of the application.

4 Pa.C.S. § 1310(a) (emphasis added). Finally, the Act enumerates a number of factors the Board must take into consideration when an applicant has been convicted in any jurisdiction of any felony or gambling-related offense. 4 Pa.C.S. § 1213.

Pocono contends that the Board erred as a matter of law by failing to review Mount Airy's character suitability under the clear and convincing evidence standard. Pocono acknowledges that the Board noted the proper standard, but asserts that the Board failed to apply that standard to the facts of this case. Pocono asks this court to review this question as an error of law, and thus, apply a *de novo* standard of review. Simply stated, Pocono invites this court to review the record in its entirety and determine whether the applicant established his suitability by clear and convincing evidence. In support of its argument, Pocono points to the BIE's report, which raised concerns related to Mount Airy's sole applicant, Louis DeNaples. According to Pocono, based on the concerns

658

raised by the BIE, the applicant did not and could not meet its burden by clear and convincing evidence.

As recognized by Pocono, the Board referenced the relevant statutory sections in its Adjudication and viewed § 1310 as an "essential eligibility criteria." Adjudication at 2. Utilizing those standards, the Board made the following relevant findings of fact:

Finding # 135: The Board conducted an extensive investigation, including comprehensive executive session Board hearings on December 4 and 5, 2006, which did not reveal any evidence that would support a finding that Mount Airy or any of its affiliates, directors, owners or key employee/qualifiers have been convicted of a felony or gambling offense in violation of Section 1213 of the Act.

Finding # 136: The Board conducted an extensive investigation, including comprehensive executive session Board hearings on December 4 and 5, 2006, which did not establish or confirm any information or evidence that would indicate that Mount Airy or any of its affiliates, directors, owners or key employees/qualifiers is of unsuitable character.

Finding # 137: Information gathered during the course of the [BIE's] investigation concerning Mount Airy and its affiliates, directors, owners, and key employee/qualifiers did not reveal any information concerning bankruptcies, civil lawsuits or judgments, criminal convictions, past activities or business practices, business associates of dealing or any other information concerning the honesty, integrity, family, habits, or reputation that would prohibit licensure of Mount Airy or its key employee/qualifiers under the provisions of the Act.

Adjudication at 33–34. Notably, however, the Board never used the magic words "clear and convincing." Surely, the Board could have avoided some of Pocono's argument by using such language. The failure to do so, however, does nothing to alter our opinion in this case. While Pocono attempts to shoehorn this inquiry into an "error of law," we decline Pocono's invitation to review this claim *de novo*. In fact,

under our limited review granted under § 1204, it would not be our role to step into the shoes of the Board and determine whether the evidence of record met the clear and convincing evidence standard in the first instance. Moreover, even if that was our role, it is unclear whether a *de novo* standard of review would ever apply to this inquiry.[14] We need not address this facet of Pocono's argument, however, as the essence of Pocono's argument is that the BIE's report uncovered too much negative evidence regarding the character of Louis DeNaples, which the Board simply could not have ignored in reaching its decision. Pocono's argument is none other than a challenge asserting that the Board capriciously disregarded the evidence of record in concluding that Mount Airy met the character suitability requirement.

The Legislature specifically authorized the Board "to promulgate regulations pertaining to the operation of the [BIE] to insure separation of functions between the [BIE] and the Board." 4 Pa.C.S. § 1202(25). Clearly, the Legislature envisioned that the BIE would be an independent arm of the Board that would satisfy the Board's investigatory role. And, in this case, the BIE conducted an independent investigation and review of the applicants under its statutory obligation and

14. As Pocono is asserting that the Board erred in applying the facts of the Mount Airy matter to the clear and convincing evidence standard, it is raising a mixed question of law and fact. We have previously indicated that the standard for reviewing mixed questions of law and fact is not settled in Pennsylvania. *See, Commonwealth v. Crawley*, 924 A.2d 612, 615–16, 2007 WL 1583583, *3–*4 (May 31, 2007); *see also Warehime v. Warehime*, 563 Pa. 400, 761 A.2d 1138, 1146 n. 4 (2000) (Saylor, J. concurring). And, the question presented is what level of deference the suitability determination by the Board should be given. The answer to this question must be evaluated on an issue-by-issue basis, since some mixed questions are more heavily weighted toward fact, while others are more heavily weighted towards law. *See generally Warehime, supra.* The more fact intensive a determination is, the more deference a reviewing court should give the conclusion below.

 While we believe that the question presented by Pocono would most likely be viewed as heavily fact-intensive, because of the nature of the proceedings before the Board, we need not reach this question in this case, since as discussed *infra*, we believe that the essence of Pocono's assertion is that the Board capriciously disregarded the character evidence in determining that Louis DeNaples met the suitability requirement.

issued a report raising concerns regarding Mount Airy's sole owner, Louis DeNaples. 4 Pa.C.S. § 1517(a.1), (2), (3). The Board's response to the BIE report, however, was not simply to ignore the concerns raised by the BIE's report, but to conduct an extensive and lengthy confidential executive session over a three-day period. At those hearings, counsel for the BIE was present and Mount Airy was given the opportunity to respond to the BIE's report. During these sessions, Board members extensively questioned Louis DeNaples, witnesses proffered by Mount Airy, BIE counsel, and witnesses offered by the BIE, to explore the concerns raised by the report. At the executive session, Mount Airy responded to each of the concerns raised by the BIE report in a coherent and thoughtful manner. Ultimately, relating to Mount Airy's application, counsel for the BIE testified as follows:

> Mr. Chairman, members of the Board, the Office of Enforcement Counsel has reviewed the background investigation conducted by the Bureau of Investigation and Enforcement, and I'm not aware of any issue that would preclude the approval of Mt. Airy Number One, LLC for a Category 2 slot machine license.

R. 953a–54a, reflecting the transcripts from the Suitability Hearings in Re: Mt. Airy Number One, December 13, 2006.

For these reasons, we conclude that Pocono has not established that the Board capriciously disregarded any evidence of record in finding that Mount Airy established its character suitability by clear and convincing evidence.

 The next challenge raised by Pocono rests on this court's decision in *Pennsylvanians Against Gambling Expansion Fund v. Commonwealth of Pennsylvania,* 583 Pa. 275, 877 A.2d 383 (2005) (hereinafter *"PAGE"*). In *PAGE*, this court held that § 1506 of the Act, which provided for exclusive authority over local land use and zoning by the Board, was unconstitutional because it impermissibly delegated legislative authority to the Board without adequate standards and guidance. 877 A.2d at 418–19. Accordingly, we severed § 1506 from the Act. *Id.* at 419. Pocono asserts that once we severed

4 Pa.C.S. § 1506 from the Act in *PAGE*, the Board could not make any type of land use or zoning considerations. In other words, so long as the proposed facility complied with all of the relevant local zoning and land use laws, following *PAGE*, the Board was **precluded from** considering any type of factors related to size and location. Thus, Pocono concludes that the Board erred as a matter of law in taking into account any considerations related to the size and location of the respective applicants' proposals in making its final decision.

Contrary to Pocono's attempts to inject *PAGE* into this case, it is clear that the Board did no more than consider the aesthetics of the various proposals, as it was permitted to do under § 1325(c)(1) (providing that the Board may consider the location and quality of the proposed facility). In considering the aesthetics of the Pocono facility, the Board concluded that the proposed quality of the Pocono facility was "palatial and of a scale not seen elsewhere in Pennsylvania." Adjudication at 91–92. Similarly, the Board concluded that the proposal was "not suitable for the mountain setting in the heart of the Pocono region." *Id.* The Board could make such an aesthetic judgment wholly independent of any zoning or land use considerations. Accordingly, we disagree that *PAGE* has any applicability to the challenge that Pocono raises.

 Finally, Pocono asserts that the adjudication and order by the Board issued on February 1, 2007 was invalid as a qualified majority did not exist on that date. Pocono acknowledges that a qualified majority existed when the Board voted on this matter on December 20, 2006, but points out that at the time it issued its adjudication, there was no longer a qualified majority.[15] As a result, Pocono concludes that on the day the adjudication and order was issued, there was not the necessary number of legislative appointees to permit the issuance "of the order and/or the ratification of any act." Brief in Support of Petition for Review at 36.

**15.** Pocono argues that one of the legislative appointees had resigned, effective December 27, 2006, and a new one did not begin his duties until February 27, 2007.

As this is a matter of statutory construction, our standard of review is *de novo* and our scope of review is plenary. *Freundt v. Penn. DOT,* 584 Pa. 283, 883 A.2d 503, 506 (2005). The Statutory Construction Act guides us in our inquiry and instructs us, in relevant part that "the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). Furthermore, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b).

Turning to the relevant language of the Act, the Act defines a qualified majority vote as follows:

**(f) Qualified majority vote.**—

(1) Except as permitted in paragraphs (2) and (3), any action, including, but not limited to, the approval, issuance, denial or conditioning of any license by the board under this part or the making of any order or the ratification of any permissible act done or order made by one or more of the members, shall require a qualified majority vote consisting of at least one gubernatorial appointee and the four legislative appointees.

4 Pa.C.S. § 1201(f)(1).

First, to the extent that Pocono is arguing that a qualified majority was necessary to "ratify" the December 20th vote, we note that a qualified majority existed on February 27, 2007, the date the transcript of the December 20th vote was ratified by the Board. In fact, we find it of special import that the bookends on either side of the February 1, 2007 adjudication and order were supported by a qualified majority vote.

As for Pocono's contention that the February 1st filing of the order had to be supported by a qualified majority, the United States Court of Claims addressed a similar issue in *David B. Lilly Co., Inc. v. United States,* 215 Ct.Cl. 572, 571 F.2d 546 (1978). In *Lilly,* the relevant adjudicative body met on February 1, 1977. On that date, a quorum determined the amount of excessive profits, considered and approved a final

opinion, and directed the opinion be mailed to the plaintiff. Subsequent to that action, but before the orders were signed and mailed, three of the board members resigned.

In upholding the agency's action, the court directed the "initial inquiry" to whether a quorum existed at the point the deliberative process occurred. *Id.* at 548–49. The deliberative process was defined as the administrative fact-finding and adjudicative process. *Id.* at 548. The court pointed out that its concern was "with the integrity of the deliberative process through which the Board acts. Plaintiff has a right to present his claim to a quorum of the Board; he did so. A quorum of the Board must fully consider the claim; it did so." *Id.* at 549. Simply stated, so long as the deliberative process was undertaken by a quorum of the board, it was of no moment that three members of that body had resigned before the orders were actually signed and mailed.

We find this analysis persuasive and conclude that the relevant action in this case was the December 20th vote. On that date, a qualified majority of the Board unanimously voted to approve or deny the licenses. Thus, we find that, for purposes of Section 1201's requirement that "the making of any order" be accomplished by a qualified majority, *see* 4 Pa.C.S. § 1202(f)(1), December 20, 2006 was the date on which the order approving and denying the licenses was "made—," i.e., the date the deliberative process culminated in a final adjudicative decision—notwithstanding that the actual order reflecting that final decision was *filed* at a later time. Furthermore, in this case, we have the additional action that occurred when that decision was unanimously ratified at the February 27, 2007 Board meeting. That action similarly met the requirement of § 1201(f)(1). In this context, as suggested above, the February 1, 2007 adjudication and order was nothing more than the shelving of the books between the supporting bookends, i.e., the ministerial act of memorializing and filing the earlier vote reflecting the adjudicative decision already made, which the Board then ratified. Accordingly, consistent with the decision in *Lilly,* we do not believe that a

664

qualified majority needed to exist on the actual filing date of the order and adjudication in this matter.

For the reasons stated herein, the Board's decision approving the license of Mount Airy is affirmed.

Justice CASTILLE, SAYLOR, EAKIN and BAER, Justice BALDWIN and Justice FITZGERALD join this opinion.