**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| STADIUM CASINO RE, LLC, | : | No. 20 MM 2023 |
| | : | |
| Petitioner | : | Appeal from the Order of the |
| | : | Pennsylvania Gaming Control Board |
| | : | at No. 9923-2021 dated February 7, |
| v. | : | 2023 |
| | : | |
| | : | SUBMITTED: January 22, 2024 |
| PENNSYLVANIA GAMING CONTROL | : | |
| BOARD, | : | |
| | : | |
| Respondent | : | |

**OPINION**

JUSTICE DONOHUE                                         **DECIDED: July 17, 2024**

Stadium Casino RE, LLC ("Stadium") challenges the decision of the Pennsylvania Gaming Control Board ("Board") to award a Category 4 slot machine license to SC Gaming OpCo, LLC and Ira Lubert (collectively "SC Gaming").[1] We affirm.

**Background**

Gaming came to Pennsylvania twenty years ago with the enactment of the Race Horse Development and Gaming Act ("Gaming Act"), 4 Pa.C.S. §§ 1101-1904. At that

---

[1] This Court has exclusive jurisdiction over appeals from licensing determinations. 4 Pa.C.S. § 1204 ("The Supreme Court of Pennsylvania shall be vested with exclusive appellate jurisdiction to consider appeals of any final order, determination or decision of the board involving the approval, issuance, denial or conditioning of a slot machine license, the award, denial or conditioning of a table game operation certificate or the award, denial or conditioning of an interactive gaming certificate, an interactive gaming license, a casino simulcasting permit or a sports wagering certificate.").

time, the Gaming Act authorized three categories of slot machines licenses. Category 1 licenses permit slot machine gaming at licensed racetrack facilities. *Id.* § 1302(a). Category 2 licenses permit slot machine gaming at a facility uncoupled from racetrack facilities "in a city of the first class, a city of the second class or a revenue- or tourism-enhanced location." *Id.* § 1304(a). Category 3 licenses are reserved for facilities located in "well established resort hotel[s]" that meet certain statutory criteria. *Id.* § 1305.

In 2017, the General Assembly authorized Category 4 slot machine licenses. *See* Act 42 of 2017, P.L. 419 (Oct. 30, 2017) ("Act 42").[2] Through the amendments to the Gaming Act effectuated by Act 42, the General Assembly provided that the Board could issue up to ten Category 4 licenses to existing Category 1, 2 or 3 licensees in good standing. The legislation provided that the process to obtain a Category 4 slot machine license would begin with an auction, the winner of which would have the right to apply for a license. 4 Pa.C.S. § 1305.2(a). Initial auctions were required to be held between January 18, 2018 and July 31, 2018. *Id.* If a winning bid was not awarded through these initial auctions, the Board was to hold subsequent auctions through August 31, 2018. *Id.* § 1305.2(b). If any subsequent auction failed to produce a bid, the General Assembly provided that the Board could determine whether to conduct further auctions. *Id.* § 1305.2(b.1). In addition to fixing a timeframe for the auctions, the General Assembly also set forth procedures for the auctions. *Id.* § 1305.2(c).

Pursuant to Act 42, the Board held five auctions between January and July 2018, resulting in the award of four Category 4 licenses. One of the winning bidders, Mt. Airy Casino, was unable to obtain the necessary funding, and so the Board ultimately denied its application. Although not all of the ten statutorily-authorized Category 4 licenses were

---

[2] Category 4 slot machine licenses permit the operation of casinos with 300 to 750 slot machines. 4 Pa.C.S. § 1305.1.

awarded, the Board conducted no further auctions before the statutory deadline of August 31, 2018.

In 2019, via an amendment to the Fiscal Code, the General Assembly instructed the Board to conduct up to five more auctions, between September 4, 2019 and December 31, 2019, for the outstanding Category 4 licenses. 72 P.S. § 1724.1-E(c)(1). The legislation also provided that if any auction failed to generate bids, the Board could not hold any subsequent auctions. *Id.* § 1724.1-E(c)(2)(iv). In September 2019, the Board conducted an auction but received no bids. Accordingly, it held no more auctions.

In May 2020, the General Assembly amended the Fiscal Code to authorize one auction for any Category 4 licenses for which a bid had been submitted but the application denied. *Id.* § 1724.1-E(e)(1). The May 2020 amendments also expanded the pool of potential bidders; while in all previous auctions only Category 1, 2, or 3 licensees in good standing were permitted to bid, the General Assembly allowed persons with ownership interests in a slot machine licensee to participate in this auction. *Id.* § 1724.1-E(e)(2)(iv). As only the Mt. Airy application had been denied, only one license was up for bid. The Board held this auction, which is the center of the present dispute, on September 2, 2020.

The September 2, 2020 auction generated bids only from Stadium and Lubert. Among other procedures established for the conduct of the auctions, Section 1305.2 requires the winning bidder to pay the bid within two days of the auction and to submit an application for the Category 4 license within six months of the date payment is made. 4 Pa.C.S. §§ 1305.2(c)(7),(10)(i). Failure of the winning bidder to make timely payment gives the second-highest bidder the right to apply for the license. *Id.* § 1305.2(c)(8). Failure of the winning bidder to timely submit the application results in the forfeiture of the right to apply for the license, as well as the amount of the winning bid. *Id.* § 1305.2(10)(ii).

Lubert submitted the winning bid of approximately $10 million. In conformance with Section 1305.2(c)(7), he timely wired the amount of the bid from his personal account to the Board. It is undisputed that although the funds were wired from Lubert's account, he did not pay the entire amount himself, as various individuals and entities contributed funds toward the payment of the winning bid. Following payment of the bid amount, Lubert began the application process. In January 2021, between the Board's acceptance of Lubert's bid and the submission of his application, Bally's Corporation announced that it signed an agreement with Lubert to jointly design, develop, construct and manage the casino planned for the Category 4 license. In March 2021, the application for the Category 4 license was submitted by SC Gaming, an entity that Lubert represented he wholly owned. Later that month, Stadium's counsel began sending a series of letters to the Board, copied to Lubert's counsel, setting forth concerns that SC Gaming was ineligible to apply for a Category 4 license because Lubert's bid was funded by persons not authorized to participate in the auction. The Board and counsel for Lubert responded. Correspondence among these three continued as the application process proceeded.

## Commonwealth Court Action

On July 21, 2021, Stadium filed a petition for review in the Commonwealth Court's jurisdiction naming both the Board and SC Gaming as respondents. Stadium sought declarations that Lubert's bid was invalid because he did not pay the entire amount with his own funds and that the Board was without the authority to consider SC Gaming's application. Stadium also sought an injunction prohibiting the Board from further considering SC Gaming's application. Additionally, Stadium prayed for an exercise of the court's mandamus power, requesting an order that would require the Board to allow Stadium to apply for the Category 4 license or, in the alternative, require the Board to conduct another auction. The Board and SC Gaming filed preliminary objections to the

petition. In March 2022, the Commonwealth Court entertained argument on the preliminary objections, although it would not rule on them for nearly a year.

### Licensing Proceedings

Meanwhile, the Board moved forward with SC Gaming's application through its licensing proceedings.[3] In August 2022 (while the preliminary objections were still pending), Stadium sought permission to intervene in the licensing proceedings to raise claims identical to those that it raised in the Commonwealth Court concerning SC Gaming's eligibility to apply for the license and the Board's ability to consider its application. Stadium also requested discovery from the Board and to present evidence through witnesses at the licensing hearing.[4] SC Gaming objected to the intervention on the basis that Stadium was attempting to usurp the Board's role and improperly disrupt the administrative proceedings. In December 2022, following a hearing, the Board granted Stadium's request to intervene. It denied Stadium's discovery request and limited its participation to the inclusion of its petition for intervention and a transcript of December

---

[3] The proceedings included investigations by the Board's Bureau of Investigation and Enforcement ("BIE") and Office of Enforcement Counsel ("OEC"), public hearings and periods of comment. The Gaming Act requires the establishment of the BIE which "shall be independent of the [B]oard" and responsible for investigating all applicants and reviewing all applications for licenses, permits or registrations provided for under the Gaming Act. 4 Pa.C.S. §§ 1517(a),(a.1). BIE's authority endures, as it also "conducts reviews of [] licensed entit[ies] as necessary to ensure compliance" with the terms of the Act. *Id.* § 1517(a.1)((6). OEC is a division within BIE that "act[s] as the prosecutor in all noncriminal enforcement actions initiated by [BIE]" and advises BIE on "all matters, including the granting of licenses permits or registrations, the conduct of background investigations, audits and inspections and the investigation of potential violations" of the Act. *Id.* § 1517(a.2). When establishing BIE, the General Assembly instructed the Board to "promulgate regulations and adopt procedures necessary to ensure that [BIE] is a distinct entity[.]" *Id.* § 1516.1.

[4] Because the Gaming Act requires some of the information provided in connection with slot machine license applications to remain confidential, *see* 4 Pa.C.S. § 1206(f), the Board opposed Stadium's attempts to gain access to that information. Nonetheless, the parties eventually entered into a confidentiality stipulation that allowed Stadium access to information compiled by the Board in the licensing proceedings.

2022 hearing in the record. The Board also allowed Stadium fifteen minutes to address the Board in oral argument at the upcoming public licensing hearing.[5] Thus, Stadium participated in the January 25, 2023 hearing on SC Gaming's application. Following this hearing and despite Stadium's opposition, the Board granted SC Gaming's application and awarded it the Category 4 slot machine license. Board Order, 1/25/2023. The Board subsequently issued an adjudication in support of its order.

The adjudication, dated February 7, 2023, addressed Stadium's concerns and explained the Board's rationale for rejecting them. With regard to Stadium's concern that SC Gaming was controlled by persons not authorized to hold a Category 4 slot machine license, the Board explained its findings that Lubert formed SC Gaming for the purpose of holding the Category 4 slot machine license, that SC Gaming has been wholly owned by Lubert since its formation, and that Lubert continued to be the sole owner of SC Gaming. The Board acknowledged SC Gaming's disclosure of an anticipated change in control that would be initiated at some point after the award of the license and that the change in control would involve multiple investors, including Bally's Corporation, the project's developer and manager. Board Adjudication, 2/7/2023, at 18. The Board explained that any change in control would be contingent upon Board approval and each individual or entity independently qualifying for licensure, including successful application processes and background checks. *Id.* The Board also addressed the statutory eligibility criteria set forth in the May 2020 Fiscal Code amendments (72 P.S. § 1724.1-E) and found that SC Gaming satisfied each. *Id.* at 20-21.

---

[5] On January 23, 2023, two days before the licensing hearing, Stadium sought leave to supplement the record with an expert report. The Board denied the request because of its late hour and the lack of time for the other parties to respond. Board Adjudication, 2/7/2023, at 15 n.6.

**Subsequent Proceedings**

On February 8, 2023, the Commonwealth Court overruled SC Gaming's and the Board's preliminary objections and ordered them to file answers within thirty days. On February 23, 2023, Stadium appealed the Board's licensing decision by filing a petition for review in this Court. *See* 4 Pa.C.S. § 1204. Shortly thereafter, Stadium sought to stay that appeal in favor of the Commonwealth Court proceedings.[6] One day later, SC Gaming and the Board petitioned the Commonwealth Court to certify its order overruling preliminary objections for interlocutory appeal and to stay further proceedings in that court. The Commonwealth Court denied this request, which spurred SC Gaming and the Board to seek permission from this Court to appeal the Commonwealth Court's order and, separately, an exercise of this Court's extraordinary jurisdiction over the proceedings in the Commonwealth Court. As those applications were pending, the Commonwealth Court granted the Board's request to stay. In September 2023, recognizing the identity of the issues pressed by Stadium in its appeal to this Court and the action it instituted in the Commonwealth Court, this Court exercised extraordinary jurisdiction over the Commonwealth Court proceedings, stayed the matter pending in that court, denied Stadium's request to stay its appeal in this Court, directed the matter to be submitted on briefs and established a briefing schedule. Per Curiam Order, 9/6/2023.[7]

**Stadium's Claims Before this Court**

Stadium presents the following issues for our review:

> 1. Did the Board exceed its statutory authority and fail to comply with mandatory directives in the Gaming Act by (a) considering SC Gaming's application for this Category 4 slot machine license, where persons prohibited from applying

---

[6] SC Gaming and the Board opposed this requested stay.

[7] The Court later denied Stadium's request for expedited oral argument and reconsideration of our September 6, 2023 order. Per Curiam Order, 2/14/2024.

hold ownership interests in SC Gaming, and (b) accepting a bid payment for the right to apply for this license funded by those same persons, rather than awarding the right to apply to Stadium (the second-highest bidder), or conducting another auction for the right to apply, pursuant to Section 1305.2(c)(8) and (10) of the Gaming Act?

2. Did the Board err and abuse its discretion by relying on an arbitrarily narrow conception of "ownership" that is inconsistent with the Gaming Act, this Court's jurisprudence, and the record evidence?

3. Did the Board err and abuse its discretion by denying Stadium an opportunity to develop a record regarding the threshold issues of statutory authority, the bid payment, and ownership?

Stadium's Brief at 6-7.

Although Stadium presents three separate issues, it argues them as one. In broad strokes, Stadium argues that in exchange for contributions to the payment of the winning bid amount, Lubert gave ownership interests in SC Gaming to persons and entities that are not eligible to bid on Category 4 slot licenses, thereby divesting the Board of the jurisdiction to entertain its application and requiring the Board to allow Stadium to apply for the license or, failing that, to hold another auction for the license. In particular, Stadium argues that Lubert "commoditiz[ed] his status as a legally-authorized bidder by issuing ownership interests in his bid and casino project to persons prohibited from bidding or applying for this license." *Id.* at 33 (emphasis omitted). He did this, Stadium alleges, by pooling investor funds in the name of an entity owned by one of the investors, LandCo, who then assigned his ownership of LandCo to Lubert one day before the auction. Stadium asserts that Lubert established a bank account two weeks prior to the auction into which the individual investors wired funds to pay the bid. This, Stadium argues, violated the requirement that the winning bidder pay the bid with his own funds or funds obtained in the ordinary course of business. *Id.* (citing 4 Pa.C.S. § 1305.2(c)(7)).

It is within this argument that Stadium raises concerns about the ownership of SC Gaming, contending that in exchange for their contributions, Lubert gave investors, who were otherwise ineligible to apply for a Category 4 slot machine license, ownership interests disguised as debt in the various entities created in connection with his proposed casino project.[8]  As detailed above, Stadium unsuccessfully raised this issue before the Board in the licensing proceedings.  Faulting the Board's decision, Stadium argues that the Board erroneously focused exclusively on ownership interests akin to common stock. Stadium argues that this is too narrow a definition, as it runs afoul of the Gaming Act and this Court's precedent, which define ownership in broad terms, and is simply not how ownership "functionally works."  *Id.* at 35.  Accordingly, Stadium premises its claim that the Board lacked jurisdiction on establishing unauthorized ownership of the applicant entity, SC Gaming.

Beginning with the Gaming Act, Stadium explains that "ownership interest" and "financial interest" are defined in other sections of the Act and given "significantly broader" definitions than the one urged by the Board here.  *Id.* at 36 (citing 4 Pa.C.S. §§ 1201(n), 1512).  Stadium also points to a decision from this Court in which we "broadly construed ownership and financial interests under the Gaming Act, consistent with the General Assembly's intentions."  *Id.* (citing *Sugarhouse HSP Gaming, L.P. v. Pa. Gaming Control*

---

[8]  It is Stadium's position that the debt bears "every indicia of ownership" because the investments accrue no interest and do not require repayment, they are treated as equity for tax purposes, and give each investor and Lubert co-equal control over the SC Gaming entities.  Stadium's Brief at 34.  Stadium points out that each investor is required to invest additional funds in the same manner equity holders can be required to invest in the companies they own and that the individual investor's debt automatically becomes membership in a particular entity, SC NewCo, upon the award of the license to SC Gaming or after five years, whichever occurs first.  *Id.*  Stadium represents that Bally's Corporation has a springing 50% ownership in HoldCo, which owns SC Gaming, and will automatically convert to common stock as soon as SC Gaming obtains the license and all necessary approvals.  *Id.*

*Bd.*, 162 A.3d 353, 376-77 (Pa. 2017)).  It points to a case involving a Category 3 license, in which this Court adopted a broad interpretation of ownership, finding that because equitable ownership was certain to convert to legal ownership, the equitable ownership sufficed to satisfy the Gaming Act's ownership requirement.  *Id.* at 37-38 (discussing *Greenwood Gaming and Ent., Inc. v. Pa. Gaming Control Bd.*, 15 A.3d 884, 889 (Pa. 2011)).[9]

Stadium contends that Lubert acted as a "Trojan horse for hire" by parceling out ownership interests in exchange for funding, and in so doing, gave entities unauthorized by the General Assembly a means by which to apply for a Category 4 slot machine license.  Because this runs afoul of Section 1305.2(c) (providing procedures for Category 4 slot machine license auctions), Stadium argues, the Board was without jurisdiction to consider SC Gaming's application.  *Id.* at 43.  In this vein, Stadium characterizes satisfaction of the bid payment requirements in Section 1305.2 – specifically, the payment of the winning bid in conformance with Section 1305.2 or the Board's reassignment of the right to apply for the license to the second-highest bidder if the winning bidder does not comply -  as a "threshold jurisdiction issue" that must be satisfied before the Board can begin the licensing proceedings.  *Id.* at 45.  In support of this theory, Stadium argues that the plain language of Section 1305.2 affords no discretion to the Board but rather mandates that certain circumstances result in a forfeiture of the right to apply and that the Board must award the right to apply to another or conduct another auction.  *Id.* at 46 (citing 4 Pa.C.S. §§ 1305.2(c)(8), (10)(ii)).  Stadium underscores that "[t]his forfeiture is

---

[9]  As additional support for its interpretation, Stadium points to the expert report that it sought to add to the record during the Board's proceedings, in which its expert opines that investors frequently use instruments such as convertible debt, exchangeable debt, and springing interests to finance ventures and that these instruments are considered to be in substance ownership or control interests.  Stadium's Brief at 40-41.  It also points out that state and federal law define ownership in terms broader than acquisition of common stock.  *Id.* at 41.

not contingent or conditioned upon any 'eligibility' investigation; it is instantaneous, after the bidder has failed to pay its bid or apply for the license in the time proscribed [sic]. … Immediately thereafter, the next-highest bidder (in this case, Stadium) has a vested statutory interest in the Board fulfilling its obligation to award the right to apply to that bidder, or to conduct another auction." *Id.* Stadium insists that its challenge to the Board's authority to consider SC Gaming's application and its compliance with the previously-described mandatory statutory directives are "threshold questions" that must precede any consideration of whether SC Gaming satisfies the licensing eligibility criteria found in Sections 1310, 1313 and 1325 of the Gaming Act. *Id.* at 47.

In summary, Stadium reiterates that the Board failed to comply with the mandatory statutory directives of Section 1305.2 in two ways. First, because Lubert did not pay the winning bid himself, he violated Section 1305.2(c)(7), and as a result, the Board was statutorily obligated to give Stadium the right to apply for the license. *Id.* at 56. Second, because SC Gaming applied for the license in violation of the restrictions in the May 2020 Fiscal Code amendments (as it was owned by persons not permitted to bid), Lubert failed to comply with Section 1305.2(c)(10)(i), and therefore forfeited his right to apply for the license, which obligated the Board to hold another auction or give Stadium the right to apply for the license. *Id.* If this Court is of the mind that there are not sufficient facts of record to resolve the issues it presents, Stadium asks that we remand for adversarial proceedings at which "the fundamental question of ownership can be decided on a full record." *Id.* at 57.

The Board disagrees with Stadium's characterization of its challenge as a matter of jurisdiction to consider SC Gaming's application. It emphasizes that the Gaming Act gives it the power and duty to perform background investigations on applicants, as well as the discretion to deny or revoke a license upon finding that an application provided

false or misleading information or otherwise failed to comply with the Act or the Board's rules and regulations. Board's Brief at 24 (citing 4 Pa.C.S. § 1207(1)). The Board describes the BIE and OEC, which investigate all applicants and applications for slot machine licenses. *Id.* at 25. Pursuant to the Board's regulations, applicants are required to provide the BIE and OEC with all information requested and authorize these offices to issue subpoenas and take sworn statements of applicants and other witnesses. *Id.* at 25-26. The BIE and OEC, by statute, are independent of the Board. *Id.* at 25 (quoting 4 Pa.C.S. § 1517(a.1)(2)).

Having laid this background, the Board contends that Stadium is conflating the concepts of statutory authority and jurisdiction. It distinguishes between statutory jurisdiction and statutory authority to act, explaining that it unquestionably has the authority to consider the application because it is the administrative body created to make licensing decisions, but no authority to approve the application if SC Gaming does not meet the statutory criteria for a Category 4 slot machine license. *Id.* at 29. In a similar vein, the Board accuses Stadium of conflating the concepts of eligibility and suitability. The Board explains that these are distinct concepts: eligibility concerns "objective statutory/regulatory based" criteria, while suitability concerns "more subjective" criteria outlined in regulations, including good character, honesty and integrity. *Id.* at 29-30.

The Board then responds to Stadium's arguments based on ownership. Preliminarily, it explains that the only reference to ownership in the May 2020 Fiscal Code amendments is a requirement that the bidder have an ownership interest in a Pennsylvania casino when making a bid and that it is undisputed that Lubert met this qualification. *Id.* at 36. It rejects Stadium's attempt to equate financial interests with ownership, allowing that while that might be an accurate proposition in some situations, the facts here do not support such a conclusion. The Board explains, "While [] Lubert's

colleagues may have financial interests in the State College casino project, these financial interests do not, at present, equate to an ownership interest and are not in any way dispositive of an ownership analysis, which is the only question at issue." *Id.* It details the ownership structure of SC Gaming, as disclosed by Lubert and SC Gaming in its application and as determined through its investigation. *Id.* at 40-45. The Board acknowledges Stadium's argument regarding the potential future interests contemplated in the debt financing; however, the Board explains that the Gaming Act allows post-licensure change in ownership and does not prohibit arrangements to obtain equity interests in the future. *Id.* at 46-47 (discussing 4 Pa.C.S. § 1328).[10]

SC Gaming also takes the position that Stadium's attempt to construct a jurisdictional argument fails. It points to the Gaming Act's provisions that vest the Board with sole regulatory authority over gaming and related activities and grant it the power to review and approve applications for slot machine licenses. SC Gaming's Brief at 24-25. SC Gaming points out that although Stadium claims that it is raising a jurisdictional issue that must be addressed before the Board can initiate the licensing proceeding, Stadium provides no statutory or regulatory authority, or case law, in support of that statement. *Id.* at 26. To the contrary, it argues, courts regularly reaffirm agencies' ability to determine the limits of their jurisdiction and statutory authority. *Id.* SC Gaming argues that the substance of Stadium's arguments rise to no more than a dispute over the Board's findings that Lubert paid the winning bid in conformance with Section 1305.2(c)(7) and

---

[10] The Board also addresses what it calls Stadium's "willful avoidance" of the administrative licensing process, shedding light on how Stadium's correspondence with its staff and the filing of the Commonwealth Court action triggered a conflict and the recusal of its Office of Chief Counsel from the licensing proceedings. Board's Brief at 49-50. The Board brings to the forefront that it granted Stadium's intervention petition, accepted its timely submissions into the record, allowed Stadium to participate in argument at the final licensing hearing, and addressed its concerns in its adjudication. *Id.* at 52.

that SC Gaming is wholly-owned by Lubert such that it was eligible to apply for the Category 4 slot machine license per Section 1305.2(c)(10)(i). *Id.* at 29.

Nonetheless, SC Gaming refutes these arguments in turn. As the Board did, SC Gaming argues that Lubert satisfied the statutory requirements imposed on the winning bidder and that consideration of whether the applicant is a permissible licensee is part of the licensure proceedings that follow the submission of the application. *Id.* at 31-46. It points to the "multi-year fact-finding investigation regarding SC Gaming's and [] Lubert's eligibility and suitability" under the Gaming Act, as well as the fact that the Board permitted Stadium to intervene and participate in the licensing proceedings specifically so that it could present evidence to prove that SC Gaming was ineligible to be a licensee. *Id.* at 45. The Board's explanation is "more than sufficient" for this Court to affirm the Board's approval of SC Gaming's application. *Id.* at 45-46. Considering the robust statutory and regulatory procedures that have created an extensive vetting process for slot machine license applications, as well as an applicant's "affirmative, statutory duty" to cooperate with the OEC and BIE, SC Gaming balks at Stadium's suggestion that it should have the ability to initiate an adversarial process to test SC Gaming's compliance with the law and fitness to hold a license. *Id.* at 49. SC Gaming refutes Stadium's claim that there is no record from which to evaluate its claims regarding Lubert's bid payment and the ownership structure of SC Gaming, pointing to their "voluminous submissions, OEC's and BIE's subsequent investigation, the extensive Suitability Report and supporting investigatory materials" as well as the Board's detailed adjudication. *Id.* at 49-50.[11] The very topics for which Stadium sought discovery were the subject of OEC's and BIE's investigations and addressed extensively in their resulting report. *Id.* at 51. Because of

_____

[11] SC Gaming reiterates the Board's point that the procedures for intervention in licensing proceedings are provided in the Board's regulations and that they provide no right to discovery for an intervening party. SC Gaming's Brief at 50-51.

the extensive record and investigation into the areas that caused Stadium concern, SC Gaming contends, the Board was within its discretion to deny Stadium's request for discovery. *Id.*

**Analysis**

As noted above, the General Assembly vested this Court with exclusive jurisdiction over appeals from any final order, determination or decision of the Board that involves the approval, issuance, denial or conditioning of a slot machine license. 4 Pa.C.S. § 1204. Our review is restricted to determining whether the Board has "erred as a matter of law[] or [] acted arbitrarily and in capricious disregard of the evidence." *Pocono Manor Invs., LP v. Pa. Gaming Control Bd.*, 927 A.2d 209, 216 (Pa. 2007). Concerning alleged errors of law, as always, our standard of review is de novo and the scope of our review is plenary. *Id.* A capricious disregard of the evidence is found "when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result." *Id.* (internal citation omitted).

Stadium argues that the Board exceeded its jurisdiction by considering SC Gaming's application before determining the legitimacy of Lubert's bid. It is Stadium's position that the Board should have determined, prior to reviewing SC Gaming's application, whether Lubert complied with the May 2020 Fiscal Code amendments when placing his bid (specifically, the eligibility of the persons and entities with interests in SC Gaming to take part in the auction). *See* Stadium's Brief at 47 (calling its challenge to the Board's compliance with statutory directives of Section 1305.2(c) a "threshold" jurisdictional question). Although eligibility to participate in the auction is defined in Section 1724.1-E(e) of the Fiscal Code, Stadium grounds its challenge in Section 1305.2(c) of the Gaming Act, arguing that Lubert's and the Board's failure to comply with

its terms divested the Board of jurisdiction to consider SC Gaming's application. Stadium relies on the fact that the process for the award of the other three categories of slot machine licenses is by application alone, without a bidding process, and suggests that because the General Assembly created a different process for Category 4 licenses, compliance with Section 1305.2(c) is a "gating" provision which must be satisfied so as to vest the Board with the jurisdiction to act on the winning bidder's application. *See* Stadium's Brief at 44. This is an issue of statutory interpretation, and so our consideration is guided by the well-established principles of statutory construction. Chief among those principles is that our objective is to discern the intent of the General Assembly and to give effect thereto. 1 Pa.C.S. § 1921(a). "The polestar indication of the legislature's intent is the plain language of the statute[,]" and where that language is clear and unambiguous, we may not disregard its plain meaning under the guise of pursuing its spirit. *SugarHouse HSP Gaming, L.P.*, 162 A.3d at 375.

Through Act 42, the General Assembly authorized ten Category 4 slot machine licenses and prescribed the manner in which the Board was to award them. Unlike the procedure used for the other categories of slot machine licenses, the General Assembly provided that the ability to apply for Category 4 slot machine licenses would be determined through auctions. 4 Pa.C.S. §§ 1305.1, 1305.2. Section 1305.2, "Conduct of Auctions" establishes when and how the Board shall conduct these auctions and direct that the fees generated therefrom shall be deposited in the General Fund. *Id.* §§ 1305.2(a),(b), (b.1),(d). Subsection (c) sets forth the procedures for these auctions:

(c) Auction procedures.--The following shall apply to the auctions conducted by the [B]oard:

> (1) Auctions shall be conducted using a competitive bidding process.

> (2) The [B]oard shall adopt procedures to prevent bid rigging and collusion among bidders and establish auction conditions,

processes or procedures. The procedures shall not be subject to review under section 205 of the act of July 31, 1968 (P.L. 769, No. 240), referred to as the Commonwealth Documents Law, sections 204(b) and 301(10) of the act of October 15, 1980 (P.L. 950, No. 164), known as the Commonwealth Attorneys Act, or the act of June 25, 1982 (P.L. 633, No. 181), known as the Regulatory Review Act.

(3) The board shall require each prospective bidder to submit a bond or letter of credit in the amount of the minimum bid under paragraph (5).

(4) Each auction shall be conducted separately.

(5) The minimum bid shall be $7,500,000. In no case may the board accept a bid that is less than $7,500,000.

(6) If the auction does not result in a winning bid, the highest bidders shall have one hour to submit a final and best bid to the board at the same public meeting. If the submission of the final bids does not result in a winning bid, the highest bidders shall continue to submit final bids, in an amount not less than or equal to a prior bid submission, until a winning bid is received.

(7) The winning bidder shall pay to the board the bid amount within two business days following the auction. Payment shall be by cashier's check, certified check or any other method acceptable to the board.

(8) If the winning bidder does not pay the bid amount within the time period required under paragraph (7), the second highest bidder shall be awarded the right to select a Category 4 location and apply for the Category 4 slot machine license, so long as the second highest bidder's bid amount meets the requirements of paragraph (5). If the second highest bidder declines the award or is ineligible to win, the board shall conduct another auction.

(9) Upon winning an auction, the winning bidder at the public meeting shall select the Category 4 location at which it intends to operate the Category 4 licensed facility. The board shall post the Category 4 location selection on its publicly accessible Internet website. The selected Category 4 location may not be selected by a subsequent winning bidder.

(10)(i) The winning bidder shall submit an application for the Category 4 slot machine license within six months of the payment of the winning bid amount. The board may, in its discretion, extend this deadline for a period not to exceed two additional months.

(ii) Failure of the winning bidder to submit an application within the time under subparagraph (i) shall result in forfeiture of the bidder's right to apply for the license and forfeiture of the winning bid amount. The board shall conduct another auction at a time determined by the board.

(11) Issuance of a Category 4 slot machine license by the board to a winning bidder shall be contingent upon the bidder's ability to meet the requirements of this part.

(12) In the event the board denies the application for the Category 4 slot machine license filed by the winning bidder, the winning bidder shall be entitled to a return of 75% of the winning bid amount the winning bidder submitted under paragraph (7). A refund under this paragraph shall be paid from the General Fund. The board shall conduct another auction at a time determined by the board.

(13) If the board approves the application for the Category 4 slot machine license filed by the winning bidder and the applicant fails to open and operate the Category 4 licensed facility, the bid amount submitted under paragraph (7) is forfeited. The board shall conduct another auction at a time determined by the board.

4 Pa.C.S. § 1305.2(c).

By its plain language, Section 1305.2(c) imposes obligations on both the winning bidder and the Board. As we have explained, Stadium argues that compliance with subsection (c)'s terms is "a gating jurisdictional issue" that the Board must resolve before it can initiate licensing proceedings. Stadium's Brief at 43. In this respect, it advances the argument that because the General Assembly created an auction procedure for these licenses in Section 1305.2(c), the Board is without discretion to deviate from those procedures such that it lacks jurisdiction to engage in licensing proceedings until subsection (c)'s requirements have been fulfilled. *See id.* at 43-47.

We agree with Stadium that the Board is bound to comply with Section 1305.2 in its entirety, including subsection (c). We also agree that applicants are required to comply with the provisions of subsection (c) that apply to them. *See* 4 Pa.C.S. § 1305.2(c)(7),(9),(10). We do not agree, however, that Section 1305.2(c) is a jurisdictional provision that limits the Board's ability to act in the manner that Stadium contends. Jurisdiction relates only to the competency of a court or administrative body to determine controversies of the general class to which the case then presented for its consideration belongs, whereas authority relates to the ability of the decision-making body to order or effect a certain result. *Domus, Inc. v. Signature Bldg. Sys. of PA, LLC*, 252 A.3d 628, 636 (Pa. 2021); *Del. River Port Auth. v. Pa. Pub. Util. Comm'n*, 182 A.2d 682, 686 (Pa. 1962). The Board is the administrative body singularly competent to conduct the Category 4 slot machine license auctions and to control the slot machine licensing application process and proceedings. 4 Pa.C.S. § 1202(a) ("The [B]oard shall have … sole regulatory authority over every aspect of the authorization, operation and play of slot machines, table games and interactive gaming devices and associated equipment"); *id.* § 1305.2; *see also* 72 P.S. § 1724.1-E(c),(e) (amendment to the Fiscal Code authorizing the Board to conduct Category 4 slot machine license auctions). Far from questioning the Board's competency to conduct Category 4 slot machine license auctions, Stadium's argument challenges only the Board's ability to proceed with the application process and licensing proceedings before satisfying Section 1305.2(c)'s requirements.

Stadium's argument in this regard seems to focus on subsections (c)(7), (8) and (10)(ii). Subsection (c)(7) requires the auction winner to pay the bid amount within two business days by cashier's check, certified check or any other method the Board deems to be acceptable. 4 Pa.C.S. § 1305.2(c)(7). Subsection (c)(8) requires the Board to award the application right to the second-highest bidder or hold another auction if the

winning bidder does not timely make payment. There are no further requirements in this provision. Subsection (c)(10)(ii) provides that the winning bidder's failure to timely submit its application results in the forfeiture of the right to apply for the license and the bid amount, and requires the Board to hold another auction. *Id.* § 1305.2(c)(10)(ii). All of these subsections involve circumstances under which a winning bidder could be stripped of the right to apply for the license. But there is no requirement or mechanism in them, or elsewhere in Section 1305.2(c), authorizing the Board to verify that the winner was eligible to bid and therefore to proceed with the auction, application and licensing proceedings. For Stadium's argument to succeed, we would have to read such a provision into the statute. This, we surely cannot do. *See Ursinus Coll. v. Prevailing Wage Appeals Bd.*, 310 A.3d 154, 171 (Pa. 2024) (recognizing that courts should not insert terms into a statute that are not there).

Stadium's argument also fails from a practical standpoint. As the winning bidder, Lubert was required to submit payment within two business days by a statutorily-permitted method and to submit an application within six months of the date he paid the winning bid amount. 4 Pa.C.S. §§ 1305.2(c)(7), (10)(i). No one disputes that he satisfied these criteria. Stadium's quarrel is with the Board's failure to consider the eligibility of Lubert's bid based on its allegations concerning the ownership of SC Gaming before progressing with the application process and licensing proceedings. Stadium insists that to comply with subsection (c), the Board was required, at that preliminary juncture, to discern whether Lubert complied or whether Stadium, as the second-highest bidder, had a right to apply for the license by virtue of subsection (c)(8), and that the Board could not proceed until it made that determination. To do so, Stadium argues, the Board needed to develop a record to settle this "gating" issue. Again, we resort to the language of the statute, which

provides no means for the development of a record or other measures to assert potential rights as a second-highest bidder at an auction.

The absence of a mechanism by which to challenge a bidder's eligibility at the auction stage is not surprising, considering the in-depth investigation performed by various divisions of the Board to vet slot machine license applicants. The Gaming Act imposes significant requirements concerning both the content and scope of slot machine license applications. *See* 4 Pa.C.S. §§ 1306, 1308-1309. These include detailed financial fitness requirements, compelling the disclosure of information to prove, by clear and convincing evidence, the financial stability, integrity and responsibility of all applicants and financial backers. *Id.* § 1313. Through this proceeding, the ownership structure of any entity proposed to hold a slot machine license is scrutinized. Moreover, third parties have the ability to intervene in licensing proceedings, as Stadium did here. *See* 58 Pa. Code § 441a.7(z). The Board agreed with Stadium that its interests were not adequately represented by the Board (by virtue of BIE and OEC), and so it permitted Stadium to participate. Board Adjudication, 2/7/2023, at 15-16. In consideration of these existing methods of review, we are hardly surprised that another layer of review was not sandwiched between the auction stage and the commencement of the application and licensing process.[12]

---

[12] As discussed, Stadium devotes significant effort to challenging the Board's factual determination that SC Gaming is wholly owned by Lubert. Stadium's Brief at 32-43, 46-47. Stadium challenges the ownership of SC Gaming to support its claim that Lubert and his investors did not comply with Section 1305.2(c). *See id.* at 43, 46-47. To be clear, Stadium challenges SC Gaming's ability to participate in the auction, not the subsequent award of the license. *Cf. Sugarhouse HSP Gaming, LP v. Pennsylvania Gaming control Bd.*, 136 A.3d 457 (Pa. 2016) (addressing challenge to award of Category 2 slot machine license based on finding related to applicant's ownership and financial interests).

## Conclusion

Stadium argues that Section 1305.2(c) is a jurisdictional provision, satisfaction of which must be met before the Board can consider an application submitted by the winner of an auction for a Category 4 slot machine license. We disagree, finding that Section 1305.2(c) only defines the Board's conduct in connection with Category 4 slot machine license auctions, not its competency to preside over slot machine auctions, application and licensing proceedings. We therefore affirm the Board's determination and dismiss the action pending in the Commonwealth Court, 249 MD 2021, as moot.

Chief Justice Todd and Justices Dougherty, Wecht, Mundy, Brobson and McCaffery join the opinion.